# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### July 26, 2016 Session

## STATE OF TENNESSEE v. BRYANT JACKSON HARRIS

**Appeal from the Criminal Court for Hawkins County**
**No. 12CR218    John F. Dugger, Jr., Judge**

---

**No.  E2015-01724-CCA-R3-CD – Filed November 4, 2016**

---

The Defendant, Bryant Jackson Harris, was convicted by a Hawkins County Criminal Court jury of first degree premeditated murder, first degree felony murder, and aggravated burglary, a Class C felony.  *See* T.C.A. §§ 39-13-202(a)(1), (2) (2014) (first degree murder), 39-14-402 (2014) (aggravated burglary).  The Defendant received an effective life sentence.  On appeal, he contends that (1) the evidence is insufficient to support his convictions, (2) the trial court erred by denying his motion for a judgment of acquittal, (3) the trial court erred by denying his motion for a new trial, and (4) the trial court erred by denying his motion for a mistrial.  We affirm the judgments of the trial court but remand the case to the trial court for corrected judgments reflecting merger of the first degree felony murder conviction with the first degree premeditated murder conviction.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed; Case Remanded**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which CAMILLE R. MCMULLEN, J., joined.  THOMAS T. WOODALL, P.J., filed a concurring opinion.

Timothy Wilkerson (at oral argument) and Richard A. Spivey (at trial), Kingsport, Tennessee, for the appellant, Bryant Jackson Harris.

Herbert H. Slatery III, Attorney General and Reporter; Lacy Wilber, Senior Counsel; Dan Armstrong, District Attorney General; and Matthew R. Blackwell, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

This case arises from a July 21, 2011 incident in which Jeffrey Smith sustained gunshot wounds. Mr. Smith died of his injuries six months later.

At the trial, a 9-1-1 recording was played for the jury. In the recording, Chuck Myers[1] reported to the 9-1-1 operator that an unidentified male was beating on the door and getting ready to shoot again. When asked by the operator whether someone had been shot, Mr. Myers said that a man had been shot twice and that the shooter was driving a blue and grey Dodge truck, which was backing out of Mr. Myers's driveway. Mr. Myers said, "What's his name, Jeff? Bryant Harris?" Mr. Myers asked the victim where he had been shot and told the operator Jeff had been shot twice in the right side, although he later said the victim was shot in the left side. Mr. Myers said that the shooter had come back inside the house and that the shooter had a long brown pistol. Mr. Myers said that the shooter was a white male wearing a white cap and a green tank top. Mr. Myers stated that the gun was in the driveway and that the shooter had a knife in his hand. Mr. Myers said that the shooter went out the front door and stood in the driveway. Mr. Myers stated that Jeff lived in Mr. Myers's basement and that the victim was still breathing and talking to him. Mr. Myers said that the shooter was sitting on a rock and that Mr. Myers saw the police arriving.

Retired Kingsport Police Detective David Cole testified that he responded to a shooting call at a house, that other officers were present at the scene when he arrived, that the victim had been taken to the hospital, and that the Defendant was in the backseat of a police cruiser. Detective Cole said that he collected evidence in the house and that blood was present inside the front door, on steps leading to a basement bedroom, and inside the bedroom. Detective Cole stated that the Defendant's truck was parked in the driveway and that he recovered a .22-caliber single-action revolver and a knife from the truck's tailgate. He said that he found five unfired rounds in the gun and three cartridge casings on the seat of the truck. Detective Cole stated that he did not find any firearms or weapons, including a lead pipe, in the house.

Detective Cole identified photographs of the crime scene, which were received as exhibits. He identified a man in one of the photographs as Chuck Myers, the homeowner. The photographs showed the entrance to the house, the downstairs hallway, which had blood spatter on the floor, a bed with blood spatter, bloodstained sheets on the bed, the Defendant's truck, a wood-handled revolver, and a closed pocket knife. The knife blade measured about two and one half inches.

Detective Cole identified a photograph of the right side of the revolver next to a firing chart constructed of bullets to document the position of the bullets in the cylinder

---

[1] The record reflects two spellings of Mr. Myers's surname. For consistency, we use Myers.

when it was recovered. He identified a photograph of three cartridge casings on the front seat of the Defendant's truck. Detective Cole said that including the cartridge casings, eight bullets were found and that no other ammunition was recovered.

On cross-examination, Detective Cole testified that he did not collect fingerprints from the revolver, that the revolver was sent to a laboratory, that he might have retired before the laboratory report was completed, and that he did not believe anyone requested fingerprint analysis on the revolver. Detective Cole said that he did not test the Defendant's hands for gunshot residue and that the police had stopped performing the tests because the results were inclusive.

Detective Cole acknowledged that in photographs taken after the police searched the house, the sheets were pulled back on the bed. He said that he probably moved the sheets when he searched under the bed. He identified the head of a cane, which was protruding over the arm of a sofa in the bedroom, and said that he did not know if he looked for a cane or a lead pipe when he searched the house. He stated that he looked under the bed and around the bed for weapons and contraband. Detective Cole noted that he did not see evidence of a violent struggle, other than a jacket that had possibly been knocked down, and that the appearance of the room was consistent with what a witness had described.

Detective Cole testified that he only spoke to Mr. Myers about the incident, that he knew Mr. Myers, that Mr. Myers did not appear to be under the influence on the day of the shooting, and that Mr. Myers had health problems which caused him to shake. Detective Cole said Mr. Myers told him that the Defendant "pushed his way past [Mr. Myers] and went down the steps and started yelling at the victim, and then he heard gunshots . . . and went down there and actually saw the last two." Detective Cole acknowledged that in the affidavit of complaint, he wrote that Mr. Myers allowed the Defendant to come inside. Detective Cole said that the victim had several telephones on his bed. Detective Cole stated that the blood spatter on the sheets indicated that the victim moved around during the shooting. Detective Cole said that he collected blood swabs from the floor and from the hall but that he did not know whether the blood had been tested for DNA.

Detective Cole testified that he did not know the Defendant went to the hospital after he was released from jail. Detective Cole said that he believed "some firearms examinations" were done to determine whether the bullets could be matched to the revolver but that he was unsure. He agreed that the knife appeared to have a clip-on attachment to facilitate being worn on a belt or a pocket. He acknowledged that many people carried a pocket knife, that the knife was closed when he found it, and that no blood spatter was present on the knife. He agreed that no evidence indicated the knife was used during the incident.

-3-

Detective Cole testified that it would be very difficult to collect fingerprints from the hammer or trigger of a gun and that he did not collect fingerprints or DNA evidence from the revolver's cylinder, barrel, or handle.

Kingsport Police Officer Bobby Lawson testified that he responded to a shooting call and that when he arrived, he saw the Defendant sitting on a large rock next to the driveway. Officer Lawson said that he took the Defendant into custody and that the Defendant did not have any weapons, although a .22-caliber pistol and a pocket knife were located on the tailgate of a truck in the driveway. Officer Lawson stated that the Defendant did not have blood stains on his clothing and that he did not appear injured. Officer Lawson said that the Defendant did not complain of any injuries or say anything to him. Officer Lawson stated that he saw Mr. Myers standing outside the house's front door and that Mr. Myers directed Officer Lawson to the victim, who was sitting on the stairs just inside the front door of the house. Officer Lawson said that the victim's skin was ashen, that the victim had blood on his face, and that the victim was holding his abdomen, gasping for air, and acting as though he were trying to vomit. After medical personnel arrived, Officer Lawson stated that he secured the house and that he did not disturb the scene. On cross-examination, Officer Lawson testified that the Defendant did not attempt to flee, that the weapons were on the tailgate of the Defendant's truck, and that another truck was parked near the Defendant's truck.

Charles "Chuck" Myers testified that in July 2011, the victim lived with him because the victim's apartment complex had closed. Mr. Myers stated that on July 21, the Defendant knocked on the door, that Mr. Myers let him in, and that the Defendant went down the steps "screaming and hollering." Mr. Myers said that the Defendant yelled, "[Y]ou low down S.O.B. I'm going to kill your a--." Mr. Myers stated that he followed the Defendant, that he saw the victim lying in bed, that the victim stood up in front of the Defendant, that the two men were four or five steps apart, that the Defendant had a gun by his side, and that Mr. Myers had not seen the gun when the Defendant came to the front door. Mr. Myers said that had he known the Defendant had a gun or was going to assault the victim, he would not have allowed the Defendant inside the house.

Mr. Myers testified that the Defendant raised the gun and shot the victim in the abdomen, that the victim fell onto the bed, and that the Defendant fired another shot, which hit the victim in the left elbow and arm. Mr. Myers said that the Defendant attempted to fire a third shot, that the gun did not fire, and that Mr. Myers saw cartridge casings fall to the floor. Mr. Myers stated that he told the Defendant to leave and that the Defendant put the gun in his pocket, pulled out a knife, and left the house. Mr. Myers said that when he told the Defendant he was going to call 9-1-1, the Defendant told him to "go ahead" and he would be "laying right here on this rock" when the police arrived.

On cross-examination, Mr. Myers identified a photograph of the revolver and said that he had never seen it before the shooting. Mr. Myers stated that the gun was not his

and that he had never seen the victim with it. Mr. Myers identified the knife in the photograph as the one the Defendant had with him. Mr. Myers said that he met the victim in 1991 and that the victim had lived with him for three weeks at the time of the shooting. Mr. Myers stated that he saw the Defendant once at a pharmacy with the victim and that he did not think the Defendant had ever been to Mr. Myers's house. Mr. Myers stated that he had never known the victim to have a cell phone.

Mr. Myers testified that he had serious health issues before the trial and that he had experienced some memory loss. He said, though, that he was clear-headed when he spoke to Detective Cole at the time of the shooting. Mr. Myers stated that he could not remember what he told Detective Cole. Mr. Myers agreed that his statement to Detective Cole was more accurate than his trial testimony. Mr. Myers said that he took one morphine pill daily in order to be able to walk. On redirect examination, Mr. Myers stated that he did not remember speaking to Detective Tincher and that before the trial, he reviewed his statements to the police. Mr. Myers said that his trial testimony was based upon his memory of events.

Dr. George Testerman, an expert in general surgery, testified that he operated on the victim when he arrived at the hospital. Dr. Testerman said that the victim had gunshot wounds to the left side of the abdomen, the thigh, and the wrist. Dr. Testerman stated that the victim had multiple injuries to the colon and duodenum. Dr. Testerman said that he closed several holes in the colon and duodenum, stopped bleeding around the pancreas, and transferred the victim to the intensive care unit. Dr. Testerman characterized the abdominal wound as life-threatening. He said that after surgery, the victim had multiple complications from his injuries, including infections, a bile leakage, and multiple organ failure, for which a ventilator, feeding tube, and tracheostomy were necessary. Dr. Testerman noted that the victim's abdominal wound never fully closed and that the victim underwent eighteen or nineteen procedures.

Dr. Testerman testified that after several weeks in the hospital, the victim suddenly deteriorated and went into cardiac arrest, was placed in the intensive care unit, and died several days later. When asked what caused the victim's death, Dr. Testerman said that the victim came to the hospital with gunshot wounds, that the victim had a complicated course of treatment, and that a sudden change in his medical condition occurred, from which he did not recover.

On cross-examination, Dr. Testerman testified that the victim had Hepatitis C, which could affect a wound's ability to heal, and that the victim had previously undergone a gallbladder operation. Dr. Testerman said that the victim died of cardiac arrest.

On redirect examination, Dr. Testerman testified that the victim's body was under a high amount of stress due to his injuries and operations. When asked whether the

operations caused the cardiac arrest, Dr. Testerman said that the victim was at a high risk to have adverse outcomes.

Dr. Karen Cline-Parhamovich, an expert in forensic pathology, testified that she performed the victim's autopsy, that the cause of death was complications from a gunshot wound to the abdomen, and that the manner of death was homicide. Dr. Cline-Parhamovich said that she recovered a bullet from the victim's abdomen and that the victim had "a lot of severe complications from the post-operative procedures and all of that was wrapped into the term complications." She stated that the victim had an open wound between the "midline" and the pubic bone. She identified an autopsy photograph showing the victim's body as it was received from the hospital, which showed an open incision and holes where a colostomy bag and a jejunoileostomy tube had been removed. She noted that the bullet recovered from the victim's abdomen was encased in fibrous tissue, which indicated a period of healing had elapsed. She said that she recovered a second bullet from the victim's left thigh.

On cross-examination, Dr. Cline-Parhamovich testified that she did not speak to Dr. Testerman before she performed the autopsy and that she was aware the victim suffered a cardiac arrest before his death. She acknowledged that the autopsy report stated it was impossible to determine the range of fire, the entrance wound, or the bullet's trajectory due to medical intervention and healing. She did not know why the bullets were not removed from the victim's body during surgery. She said that occasionally, a bullet could be left intentionally in a person's body. She agreed that the autopsy report noted a blunt force trauma to the head and that the injury occurred at some point before the victim's death. She agreed that the head injury could have been indicative of a fight. Dr. Cline-Parhamovich stated that relative to contributing conditions, the victim had coronary artery disease in one vessel, an enlarged heart, emphysema, hepatitis, and chronic pancreatitis that could have resulted from the victim's multiple surgeries or from alcohol abuse. She said that a fatty liver was not an indication of Hepatitis C because it could have been caused by diet or alcohol abuse.

On redirect examination, Dr. Cline-Parhamovich testified that in a case in which a shooting incident occurred five or six months before an autopsy, the range of fire was unlikely to be detected. She said that her standard protocol did not include talking to a decedent's physicians. She stated that the victim's other conditions did not contribute to or cause the victim's death. On recross-examination, Dr. Cline-Parhamovich said that cardiac arrest was not a valid cause of death and that cardiac arrest was the final thing to occur before anyone died. She stated that she was aware of one occasion in September in which the victim had to be defibrillated and a second occasion in November in which the victim's heart stopped, his brain received insufficient blood, and "that's what led to him not recovering." On further redirect examination, Dr. Cline-Parhamovich said that none of the victim's complications or cardiac arrests would have happened if he had not been shot.

The Defendant testified that he was age sixty-three and that the victim was his wife's half-brother. The Defendant said that he had known the victim since the victim was age seven, that the Defendant and the victim had worked together for more than twenty years at the Defendant's father's construction company, and that the Defendant treated the victim like his son. The Defendant stated that he had a close relationship with the victim and that the victim visited the Defendant's house weekly for Sunday dinner, including the Sunday before the shooting. The Defendant said that no conflicts arose during the dinner.

The Defendant testified that the day before the shooting, he saw the victim at a bowling alley, that the victim was intoxicated, and that the Defendant gave the victim vegetables from his garden as well as $100 from the Defendant's wife. The Defendant denied having "cross words" with the victim. The Defendant said that he went to the victim's house the following day at the Defendant's wife's request because she could not reach the victim by telephone and was concerned. The Defendant said that the victim had five cell phones but would not answer any of them. The Defendant denied having ever owned a pistol and taking a pistol to the victim's house. The Defendant acknowledged that he carried a knife daily around the house and said that he lived on a farm. The Defendant denied going to the victim's house with the intent to harm anyone.

The Defendant testified that when he arrived at the house, Mr. Myers opened the front door and told him to come inside. The Defendant said that he asked where the victim was, that Mr. Myers pointed downstairs, that Mr. Myers closed and locked the front door, that the Defendant turned to go downstairs, and that Mr. Myers kicked him in the back. The Defendant stated that he fell down the stairs, that he was injured, and that he landed on his knees and shoulders. The Defendant said that the victim stood by the bedroom door, that the victim was not lying in bed, and that the victim wore pajamas. The Defendant stated that the victim beat the Defendant with a cane or pipe, that the Defendant grabbed the object, that the victim reached under a pillowcase and pulled out a pistol, that the Defendant heard the victim curse and the gun hammer click, that the Defendant grabbed the victim's arm and attempted to push the pistol away, and that the Defendant was in fear for his life.

The Defendant acknowledged that he weighed 285 pounds and was a strong man but said that he was frightened. The Defendant said that the victim was five feet, ten or eleven inches tall and weighed more than 230 pounds. The Defendant said that during the struggle over the gun, the victim held the gun and that the gun fired three times. The Defendant stated that he was on the floor and that the gun was pointed upward when it fired. The Defendant denied intending to shoot or kill the victim. The Defendant said that he realized the victim had been shot as soon as the gun fired.

The Defendant testified that he served in the military and that although he only shot rifles during that time, he knew the sound of a cocking handgun hammer. The

Defendant stated that after the victim was shot, the victim walked out the door "through the basement towards [the Defendant's] truck" and to the front of the house. The Defendant said that the gun was on the bedroom floor, that he picked up the gun because he did not want the victim to shoot at him again, that the Defendant went to his truck and attempted to empty the cartridge casings out of the gun, and that the Defendant placed the gun on the bed of his truck. The Defendant stated that he returned to the house to check on the victim, that he did not remove his knife from his belt, and that he did not harm anyone. The Defendant said that he took three bullets off the victim's bedroom table and placed them in the gun because bullets could harm people. The Defendant stated that he placed his knife on his truck's tailgate and sat on the tailgate while waiting for the police.

The Defendant testified that Officer Lawson arrived, that the Defendant obeyed his command to get on the ground and put his hands behind his back, that Officer Lawson arrested him, and that the Defendant remained in jail for two nights. The Defendant said that he left the jail in a wheelchair and using a cane. The Defendant denied intending to harm anyone when he went to the house or having seen the victim with the revolver previously. The Defendant said that he felt sad for the victim and hated that "it all happened." He stated that he could not believe what the victim did to him.

The Defendant testified that the victim lived with him for about six months due to financial troubles, that the Defendant provided the victim food, clothing, and spending money, and that the Defendant took the victim to work and other appointments. The Defendant said that when the victim moved to an apartment, the Defendant and his wife paid the rent and utility bills, bought him furniture, and gave him grocery money. The Defendant stated that after the victim moved out of the apartment six or seven months later, the victim continued calling and visiting the Defendant on Sundays. The Defendant said that on the day of the shooting, he went to the victim's house between 4:00 and 4:30 p.m., that the victim appeared to be healthy, and that the victim wore pajamas. The Defendant stated that his daughter took photographs of his injuries when he was released from jail.

On cross-examination, the Defendant testified that Pearl Smith was the victim's mother and the Defendant's wife's mother. The Defendant said that in 2008, Ms. Smith lived in a nursing home and that she broke both femurs in a fall. The Defendant stated that his wife filed a lawsuit on her mother's behalf, that the lawsuit was settled in 2009 for $210,000, and that about half of the money covered attorney fees. The Defendant did not know whether the settlement upset the victim and denied having discussed it with him. The Defendant did not know whether the victim threatened to sue the Defendant's wife for a portion of the settlement money. The Defendant said that he attended a court hearing about Ms. Smith's case but that he waited for his wife outside the courtroom. He stated that the victim was incarcerated at the time of the hearing.

The Defendant testified that he did not keep track of the victim's cell phone number and that his wife told him the victim had not answered his cell phones since the day before the shooting. The Defendant said that he had been to the victim's house about a month before the shooting and that Mr. Myers and the Defendant's wife were there. The Defendant stated that when he arrived at the victim's house the day of the shooting, he went to the basement door, that Mr. Myers opened the front door and shouted for the Defendant to come in through the front door, and that the Defendant walked to the front door. The Defendant said that he met Mr. Myers six or eight months previously but that he did not know him well. The Defendant stated that he used a cane to walk but that on the day of the shooting, he left his cane in his truck. The Defendant said that he did not remember how many steps he fell down and that he hit his elbow, shoulders, and knees. The Defendant stated that on the day of the shooting, he wore shorts, a tank top, and a purple hat.

The Defendant testified that although he could not walk when he left the jail on July 23, he had no reason to ask for medical attention, that he had been scheduled for a myelogram on July 28, that he went to the emergency room on July 26, and that he reported being kicked down steps and hit with a crowbar in the left arm. The Defendant said that the object felt like a crowbar. The Defendant agreed that due to the incident, he complained of tenderness in his left eye, left side, left arm, and left shoulder, and that he had tenderness in the back of the neck due to preexisting spinal stenosis. The Defendant acknowledged that the emergency room record noted no evidence of head trauma. The Defendant said that he had shoulder replacement surgery in the 1990s and had back surgery in 1991 and that his prior surgeries were not the cause of his July 26 medical complaints. He acknowledged that his x-rays revealed no evidence of acute traumatic injury or fractures and that the radiology report noted moderate degenerative disc disease in his back.

The Defendant testified that when the victim beat him, he was unable to take the item away from the victim and let go of the item when the victim grabbed the gun, that the Defendant was on the floor when the victim grabbed the gun, that the Defendant was between six and eight feet from the bed, and that the victim retrieved the gun from under a pillowcase next to the door. The Defendant stated, though, that the pillowcase could have been a cushion, the couch, or a clothes basket. The Defendant agreed that the victim was shot in the "lower extremities," that the victim left the house after he was shot, that the gun's hammer had to be fully cocked between shots, and that two physical actions were required to fire the gun. The Defendant said that the victim left the house after being shot and that the victim did not return. The Defendant stated, though, that the victim was found upstairs in the house.

The Defendant testified that after the victim left the bedroom, the Defendant picked up the gun from the floor and three bullets from a table, crawled to the door, and saw the victim slam the door of the Defendant's truck and walk up the front sidewalk.

The Defendant said that he kept the three bullets in his hand, walked to his truck, and tried to remove the cartridge casings from the revolver's cylinder. When asked why he reloaded the gun, the Defendant stated, "I wasn't reloading, I wasn't going to put the shells in my pocket. The Defendant denied reloading the gun in order to "go back in and finish the job[.]" When asked what danger the bullets posed if the Defendant had the gun, the Defendant said that he did not want the victim or Mr. Myers to shoot him. When asked how the men could shoot the Defendant if he had the gun, the Defendant stated that there were two of them. The Defendant said that he should have left in his truck when he had the opportunity.

The Defendant denied going to the house because the victim was "raising a stink" about the lawsuit settlement and harassing the Defendant's wife. The Defendant denied going to the house to kill the victim, taking the gun into the house, shooting the victim, and returning to the truck to retrieve more bullets. When asked what happened to a bullet that was not recovered, the Defendant said he did not know. The Defendant said that although he was not familiar with pistols generally, anyone could unload and reload a gun. When asked whether the Defendant was calm enough to reload the gun after being in a physical altercation, the Defendant said, "You don't have calmness of mind, you have the adrenaline."

The Defendant testified that he could walk short distances without his cane but was still at risk for falling. He said that he was right-handed. When told the jail records reflected he was released on the evening of Friday, July 22, the Defendant said that he lost track of time in jail.

On redirect examination, the Defendant testified that he picked up the extra bullets because he did not know if the victim and Mr. Myers had another gun. The Defendant acknowledged the emergency room records stated he had contusions on his forearm, humerus, and back, and sprains and strains on the back and neck. The Defendant agreed that he never told anyone at the hospital he had broken a bone, that he went to the emergency room on the advice of counsel to document his injuries, and that his daughter took photographs of his injuries the day after he was released from jail.

Sixteen photographs of the Defendant were received as exhibits. The Defendant testified that the photographs showed bruises, a black eye, bruises and swelling on the back, a contusion on the left knee, and bruises on the elbow, forearm, left upper arm, right elbow, and right arm. He said that the left shoulder showed bruises near his neck and collarbone. He said that the photograph of the left arm and shoulder showed the shape of the object that beat him. The Defendant said that the injuries were a result of the struggle he had with the victim. The darkest bruising on the back was in the shape of a slender rectangle with parallel edges.

On recross-examination, the Defendant testified that when he went back in the house to check on the victim, he had his knife on his belt and that Mr. Myers was on the telephone with 9-1-1. The Defendant did not remember Mr. Myers's asking him where the gun was located, although he acknowledged hearing the question in the 9-1-1 recording. The Defendant agreed that he did not tell Mr. Myers where the gun was located and that when the Defendant went to the emergency room, he did not need medical attention.

Sherrie Harris, the Defendant's wife, testified that she had been married to the Defendant for forty-four years and that the victim was her half-brother. She said that she had a good relationship with the victim, that the victim came to her house for dinner regularly, that she had known the victim his whole life, and that they had the same mother. Ms. Harris stated that she was eight years older than the victim, that she babysat him when he was young, that they grew up in the same house, and that she loved him as her brother. Ms. Harris said that the victim called her between fifteen and twenty times every day and that she did not know the victim's friends. Ms. Harris stated that the victim relied on her and that she was like his second mother. Ms. Harris denied having a problem with the victim relative to the lawsuit settlement and said they never argued about it.

Ms. Harris testified that on the day before the shooting, she saw the victim at a flea market near a bowling alley and that she gave the victim vegetables from her garden and $100 because he needed money. She said the victim was intoxicated. On the day of the shooting, Ms. Harris said that she had not heard from the victim since the previous day, that the victim had been intoxicated for days, and that the victim had not called her or answered her calls to his cell phones. She stated that she asked the Defendant to check on the victim.

Ms. Harris testified that the victim had lived with them for about six months until they helped him obtain an apartment close to his work. She said that she helped him buy furniture and clothes and that she and the Defendant paid the rent and utilities. She said that her mother obtained a burial insurance policy on the victim when he was a baby and that Ms. Harris continued paying the premiums after her mother died because the victim "never was a responsible person." She said that the policy paid $1100 and that she and the Defendant paid the victim's remaining funeral expenses.

On cross-examination, Ms. Harris testified that she loved the Defendant, that she was testifying on his behalf, and that she did not want him to be in trouble. Ms. Harris said that she was Ms. Smith's power of attorney before Ms. Smith's death on January 6, 2009, and that Ms. Smith sustained injuries as a result of an accident in a nursing home. Ms. Harris agreed that she filed a lawsuit against the nursing home and that the matter was settled. When asked whether the settlement consisted of a substantial sum of money,

-11-

she said the money "wasn't a whole lot. My mother was more important." Ms. Harris said that the victim was not a party to the lawsuit.

Ms. Harris said that the last time the victim called her was 10:00 p.m. the night before the shooting and that the victim was "pretty drunk" at that time. Ms. Harris stated that she did not accompany the Defendant to the victim's house. She said that she did not know what happened at the victim's house until about 10:00 p.m. that night. Ms. Harris stated that the Defendant was injured when he got out of jail and that he went to the doctor. When asked whether the Defendant went to the doctor at someone else's direction, Ms. Harris responded, "He really had to go. My husband was black and blue." Ms. Harris acknowledged that she did not know the source of the Defendant's injuries. Ms. Harris said that although she loved the victim, she did not visit him in the hospital because she chose her husband and because she "knew how [the victim] was." She stated that she asked her pastor to visit the victim in the hospital. On redirect examination, Ms. Harris stated that on the day of the shooting, the Defendant did not have a pistol when he left the house and that he had never owned a pistol.

James Nienast, the Defendant's son-in-law, testified that the victim lived with him for more than a month in 2009 and that the victim owned a gun. Mr. Nienast identified the revolver in the crime scene photograph as the victim's gun. He said that he did not see the victim between 2009 and one and one-half days before the shooting, when he saw the victim at the Defendant's house during a family dinner.

John Love testified that he was the Defendant and Ms. Harris's church pastor. He said that he had known the Defendant for twenty-five years, that they had a close relationship, that the Defendant had a reputation for truthfulness, and that Mr. Love had visited the victim four times in the hospital at Ms. Harris's request. On cross-examination, Mr. Love stated that he was not present at the shooting and that he was testifying at the Defendant's request.

Philip White, Phillip Kendrick, Lawrence Tasker, Glenn Calhoun, Bobby Branch, and Donald Brown testified about the Defendant's reputation for truthfulness and said that they were not present at the shooting. Mr. White stated that he had known the Defendant for more than thirty years and that he was related to the victim. Mr. Kendrick stated that he had known the Defendant for forty-five years, that he and the Defendant had attended high school and had worked together, and that he was testifying because he believed in the Defendant. Mr. Tasker stated that he was the Defendant's next-door neighbor, that he had known the Defendant for twenty-two years, and that he did not believe the Defendant was guilty and knew the Defendant to be a good man. Mr. Calhoun stated that he had known the Defendant for twenty-five years and that he considered the Defendant a friend. Mr. Branch stated that he had known the Defendant for six years and that the Defendant attended Mr. Branch's church for approximately four

years.  Mr. Brown stated that he had known the Defendant for approximately six years and that he met the Defendant at church.

Upon this evidence, the Defendant was convicted of first degree premeditated murder, first degree felony murder, and aggravated burglary.  The trial court ordered concurrent sentences of life imprisonment for the first degree premeditated murder and felony murder convictions and six years for the aggravated burglary conviction.  This appeal followed.

## I & II

### Sufficiency of the Evidence & Motion for Judgment of Acquittal

The Defendant contends that the evidence is insufficient to support his convictions.  In a related issue, he contends that the trial court erred by denying his motion for a judgment of acquittal.  In both issues, the Defendant argues that (1) the medical experts offered conflicting testimony relative to the cause of death, therefore the jury could not conclude beyond a reasonable doubt that the gunshot wound killed the victim and (2) the proposition that the Defendant pushed past Mr. Myers, thereby entering the house without Mr. Myers's effective consent, was based solely upon the trial testimony of a police officer, who admitted he wrote in his report that Mr. Myers told him he allowed the Defendant to enter the house.  The State responds that the evidence is sufficient, that the medical experts did not significantly disagree, and that Detective Cole's testimony established that the Defendant pushed past Mr. Myers, thereby entering the house without effective consent.

In determining the sufficiency of the evidence, the standard of review is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007).  The State is "afforded the strongest legitimate view of the evidence and all reasonable inferences" from that evidence. *Vasques*, 221 S.W.3d at 521.  The appellate courts do not "reweigh or reevaluate the evidence," and questions regarding "the credibility of witnesses [and] the weight and value to be given the evidence . . . are resolved by the trier of fact."  *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *see State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984).

"A crime may be established by direct evidence, circumstantial evidence, or a combination of the two." *State v. Hall*, 976 S.W.2d 121, 140 (Tenn. 1998); *see State v. Sutton*, 166 S.W.3d 686, 691 (Tenn. 2005).  "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'"  *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

The standard of review for a trial court's denial of a motion for a judgment of acquittal is the same as the "standard that applies on appeal in determining the sufficiency of the evidence[.]" *State v. Little*, 402 S.W.3d 202, 211 (Tenn. 2013).

## A. First Degree Premeditated Murder

Relevant to this case, first degree murder is the unlawful, intentional, and premeditated killing of another. T.C.A. §§ 39-13-201, 39-13-202(a)(1). In the context of first degree murder, intent is shown if the defendant has the conscious objective or desire to cause the victim's death. *State v. Page*, 81 S.W.3d 781, 790-91 (Tenn. Crim. App. 2002); T.C.A. § 39-11-106(a)(18) (2010) (amended 2011, 2014) (defining intentional as the "conscious objective or desire to engage in the conduct or cause the result"). A premeditated act is one which is

> done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill preexist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

*Id.* § 39-13-202(d). The question of whether a defendant acted with premeditation is a question of fact for the jury to be determined from all of the circumstances surrounding the killing. *State v. Davidson*, 121 S.W.3d 600, 614 (Tenn. 2003). Proof of premeditation may be shown by direct or circumstantial evidence. *State v. Brown*, 836 S.W.2d 530, 541 (Tenn. 1992). As a result, the jury "may infer premeditation from the manner and circumstances of the killing." *State v. Jackson*, 173 S.W.3d 401, 408 (Tenn. 2005); *see State v. Vaughn*, 279 S.W.3d 584, 595 (Tenn. Crim. App. 2008).

In the light most favorable to the State, Mr. Myers testified that the Defendant drove to the house, entered the house, and went downstairs to the victim's bedroom shouting, "You low down S.O.B. I'm going to kill your a--" and that the Defendant produced a gun and shot the victim three times. The victim was shot in the left side and received severe abdominal injuries. In the 9-1-1 call, Mr. Myers stated that the Defendant shot the victim. After six months of medical intervention, the victim died. The jury by its verdict discredited the testimony of the Defendant and Ms. Harris and credited Mr. Myers's testimony, and we will not reweigh determinations of witness credibility on appeal. A rational jury could have found beyond a reasonable doubt that the Defendant intentionally and with premeditation shot the victim.

Relative to whether the Defendant's shooting the victim caused the victim's death, the Defendant's argument that expert testimony conflicted is without merit. Dr.

-14-

Testerman, an expert in general surgery, stated that the victim, who was at high risk for adverse medical outcomes as a result of his gunshot wounds, died of cardiac arrest and that several factors contributed to the death. However, Dr. Cline-Parhamovich, an expert in forensic pathology, stated that cardiac arrest was not a valid cause of death because cardiac arrest was the final event to occur before every person died. Dr. Cline-Parhamovich testified that the victim's cause of death was complications from an abdominal gunshot wound. She also stated that the victim's underlying medical conditions did not contribute to or cause his death and that none of the complications resulting from the victim's surgeries would have occurred had he not been shot. The jury, by its verdict, credited Dr. Cline-Parhamovich's testimony and resolved any conflicts in the expert testimony in the State's favor. We will not reweigh the evidence on appeal. The Defendant is not entitled to relief on this basis.

## B. Aggravated Burglary

Aggravated burglary is defined as the burglary of a habitation. T.C.A. § 39-14-403 (2014). Burglary, in relevant part, is defined as entering without the owner's effective consent a building other than a habitation "not open to the public, with intent to commit [an] . . . assault[.]" *Id.* § 39-14-402(a)(1) (2014). A habitation is "any structure . . . designed or adapted for the overnight accommodation of persons[.]" *Id.* § 39-14-401(1)(A) (2014). Effective consent is defined as "assent in fact, whether express or apparent . . . Consent is not effective when . . . [i]nduced by deception[.] *Id.* § 39-11-106(a)(9)(A) (Supp. 2011) (amended 2014). Deception is defined, in relevant part, as failing "to correct a false impression of law or fact the person knows to be false[.]" *Id.* § 39-11-106(a)(6)(A)(iii) (Supp. 2011) (amended 2014). However, a defendant does not deceive a person by passively failing to correct a mistake of intention or other state of mind. *State v. Pope*, 427 S.W.3d 363, 372 (Tenn. 2013).

At the trial, Detective Cole testified that Mr. Myers told him the Defendant "pushed his way past him and went down the steps and started yelling at the victim[.]" Although Mr. Myers's testimony and the Defendant's testimony reflected that Mr. Myers allowed the Defendant to come inside, the jury, by its verdict, credited Detective Cole's testimony that the Defendant pushed past Mr. Myers and, therefore, entered the house without Mr. Myers's effective consent. We note Mr. Myers stated that his memory was more accurate at the time he spoke to Detective Cole than it was at the trial and that his statement to the police reflected his memory of events at the time of the shooting. We will not reweigh the evidence on appeal.

Relative to the remaining elements of aggravated burglary, Mr. Myers testified that when the Defendant entered the house, he went downstairs "hollering" at the victim that he was going to kill him. The evidence is sufficient for a rational jury to find beyond a reasonable doubt that the Defendant entered the house with the intent to assault the victim, and the Defendant is not entitled to relief on this basis.

## C. First Degree Felony Murder

The Defendant was also convicted of felony murder committed in the perpetration of an aggravated burglary, an alternative theory of criminal liability for first degree murder. *See Carter v. State*, 958 S.W.2d 620, 624-25 (Tenn. 1997); T.C.A. § 39-13-202(a)(2), (b) (2014).

First degree felony murder is, in relevant part, the "killing of another committed in the perpetration of or attempt to perpetrate . . . burglary[.]" *Id.* § 39-13-202(a)(2). "No culpable mental state is required for conviction . . . except the intent to commit the enumerated offenses or acts[.]" *Id.* § 39-13-202(b).

Aggravated burglary is defined as the burglary of a habitation. *Id.* § 39-14-403. Burglary, in relevant part, is defined as entering without the owner's effective consent a building other than a habitation "not open to the public, with intent to commit [an] . . . assault[.]" *Id.* § 39-14-402(a)(1). A habitation is "any structure . . . designed or adapted for the overnight accommodation of persons[.]" *Id.* § 39-14-401(1)(A).

As we concluded above, the evidence is sufficient for a rational jury to have found beyond a reasonable doubt that the Defendant committed aggravated burglary, that the Defendant shot the victim in the perpetration of the aggravated burglary, and that the victim died as a result of his injuries. The Defendant is not entitled to relief on this basis.

## III

## Mr. Myers's testimony

The Defendant contends that Mr. Myers's testimony should have been stricken because he had a lack of "authentic memory" due to health issues and because his trial testimony was inconsistent with previous statements. The Defendant argues that the trial court erred by admitting Mr. Myers's testimony. The State responds that the trial court did not abuse its discretion and that the Defendant did not request Mr. Myers's testimony be stricken and, as a result, the issue is waived.

As a preliminary matter, we note that the Defendant's argument challenging Mr. Myers's competency to testify is included in his sufficiency of the evidence allegation. However, the issue is argued in the context of the Tennessee Rules of Evidence governing witness competency. We will consider it as an evidentiary issue.

Tennessee Rule of Evidence 601 states that witnesses are presumed to be competent to testify. A witness must have personal knowledge of the subject matter about which he or she testifies. Tenn. R. Evid. 602. "A party may offer evidence that a witness suffered from impaired capacity at the time of an occurrence or testimony."

Tenn. R. Evid. 617.  We review a trial court's decision relative to witness competency under an abuse of discretion standard.  *State v. Kendricks*, 947 S.W.2d 875, 881 (Tenn. Crim. App. 1996).

The record reflects that trial counsel objected to Mr. Myers's testimony when Mr. Myers could not recall the victim's surname.  In a bench conference, trial counsel expressed concern that Mr. Myers was "obviously deeply under the influence of some narcotics."  The prosecutor responded that he had met with Mr. Myers three times and that his demeanor had always been the same as it was at the trial.  When asked whether Mr. Myers was sick, the prosecutor responded affirmatively and said that Mr. Myers went to the Veterans Administration weekly.  In a jury-out hearing, Mr. Myers told the trial court that he had not ingested drugs or alcohol in the past twenty-four hours, that he felt clear-headed, that he was nervous, and that he "got sick in January and my memory is a little bit bad[.]"  Mr. Myers stated that he took one morphine pill daily "so I can walk" and that he could answer questions.  The court allowed Mr. Myers to testify.

We conclude that the trial court did not abuse its discretion by allowing Mr. Myers to testify.  Although Mr. Myers could not initially recall the victim's surname and testified that he had some memory problems and was nervous, he also testified that he was clear-headed, could answer questions, and had not ingested alcohol or drugs other than his prescribed morphine pill.  The court's decision was supported by the record.  Relative to sufficiency of the evidence, we note that trial counsel thoroughly cross-examined Mr. Myers relative to his memory of events and whether his testimony was based on his review of the statements he made to the police.  Mr. Myers said that his testimony was based on his memory of events.  The jury was fully aware of Mr. Myers's memory issues and, by its verdict, credited his testimony.  The Defendant is not entitled to relief on this basis.

## IV

### Mistrial

The Defendant contends that the trial court erred by denying the Defendant's motion for a mistrial after the prosecutor asked the Defendant whether he told any police officers at the crime scene "any of this," referring to the Defendant's trial testimony.  The Defendant argues that the question highlighted the Defendant's invoking his right to remain silent at the scene and that the court's curative instruction only further emphasized the Defendant's silence.  The State responds that no manifest necessity for a mistrial existed because trial counsel objected before the Defendant answered the question and because the court sustained the objection and provided a curative instruction.

During the Defendant's cross-examination, the prosecutor asked, "And it's true . . . that you never told any police officer that came to the scene any of this, right?" Trial counsel objected and during a bench conference, argued that the question violated the Defendant's Fifth Amendment right. The prosecutor argued that the question was relevant to the Defendant's credibility. The trial court sustained the objection and told the jury, "The last question that was asked, just disregard that question and any possible response . . . The defendant has a constitutional right against self-incrimination[.]"

After a recess and before the jury returned, trial counsel requested a mistrial. The trial court denied the motion, finding that the curative instruction was sufficient to correct any possible implications created by the question, given that the question did not imply whether the Defendant invoked his right to remain silent and that the Defendant did not answer the question. No further instructions relative to the Defendant's right to remain silent were given or requested by the parties.

A trial judge should declare a mistrial if manifest necessity arises. *Arnold v. State*, 563 S.W.2d 792, 794 (Tenn. Crim. App. 1977). Manifest necessity occurs when "no feasible alternative to halting the proceedings" exists. *State v. Knight*, 616 S.W.2d 593, 596 (Tenn. 1981). "The granting or denial of a mistrial is within the sound discretion of the trial court." *State v. McKinney*, 929 S.W.2d 404, 405 (Tenn. Crim. App. 1996); *see State v. Jones*, 802 S.W.2d 221, 222 (Tenn. Crim. App. 1990). This court will only disturb that decision if the trial court abused its discretion. *State v. Adkins*, 786 S.W.2d 642, 644 (Tenn. 1990).

We cannot conclude that manifest necessity for a mistrial existed. The judge's curative instruction was sufficient because it instructed the jury to disregard the question. Relative to the Defendant's contention at oral argument that the judge prejudiced the Defendant by naming the right against self-incrimination instead of using the words "right to remain silent," the Fifth Amendment right to remain silent is a judicially-articulated facet of the right against self-incrimination, and the judge did not misstate the law. The Defendant is not entitled to relief on this basis.

## V

## Merger

At oral argument, this court raised the issue of whether the first degree premeditated murder and felony murder convictions should have been merged. Because the convictions involved the death of one victim and represented alternating theories of guilt for the same offense, the convictions should have been merged. *See State v. Price*, 46 S.W.3d 785, 824 (Tenn. Crim. App. 2000). Therefore, we remand the case to the trial court for the entry of corrected judgments reflecting the merger of the first degree felony murder conviction with the first degree premeditated murder conviction.

In consideration of the foregoing and the record as a whole, the judgments of the trial court are affirmed, and the case remanded for the entry of corrected judgments.

_____
ROBERT H. MONTGOMERY, JR., JUDGE